159 F.3d 388
 98-2 USTC P 50,856, 22 Employee Benefits Cas. 1887,
98 Cal. Daily Op. Serv. 7871,
98 Daily Journal D.A.R. 10,924,
Pens. Plan Guide (CCH) P 23948R
 Florett BURREY; Ralph Brown; Florisa Aliabadi; Denise
Barr; John Chyka; Craig Easley; George Hollie, II; Cliff
J. Jackson; Mark Molina; Edilberto Natividad; Sonja
Nelson; Pauline Roy; Virginia Tiu, Plaintiffs-Appellants,
v.
PACIFIC GAS AND ELECTRIC COMPANY; Pacific Gas & Electric
Company Benefit Administration Committee; PG & E Retirement
Plan; Pacific Gas & Electric Savings Fund Part 1; Pacific
Gas & Electric Health & Welfare Plan; Pacific Gas &
Electric Company Severance Plan, Defendants-Appellees.
 No. 97-15976.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 14, 1998.
Decided Oct. 20, 1998.
 
 Janet E. Brown, Sigman, Lewis & Feinberg, Oakland, California, for plaintiffs-appellants.
 Maureen L. Fries, San Francisco, California, for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California; D. Lowell Jensen, District Judge, Presiding. D.C. No. CV-97-04638-DLJ.
 Before: LAY,* KOZINSKI and T.G. NELSON, Circuit Judges.
 LAY, Circuit Judge:
 
 
 1
 Florett Burrey and twelve other plaintiffs brought this action under the Employee Retirement Income Security Act of 1974 (ERISA) against Pacific Gas & Electric Co. ("PG & E"), several of its employee benefit plans, and the PG & E Employee Benefit Administrative Committee. The district court granted summary judgment in favor of PG & E on all claims. We reverse in part, and affirm in part.
 
 
 2
 The plaintiffs in this case worked at various times at PG & E's Marketing Processing Center ("Center"), which serviced PG & E's energy conservation programs.[1] In 1983, PG & E informed all temporary employees working at the Center, including the plaintiffs, that they would continue to work at the Center as employees of Volt Energy Services, Inc., an employment agency. In January 1988, PG & E terminated its agreement with Volt and awarded a new employment contract to Pacific Coast Clericals ("PCC"). PG & E informed the Center employees, including the plaintiffs, that they would continue working at the Center as PCC employees. The plaintiffs agreed and continued their employment at the Center after the effective date of the PCC employment contract. PCC subsequently changed its name to Stafco Personnel Management, Inc. In January 1993, Stafco Personnel Management, Inc. transferred the contract to its subsidiary, Stafco, Inc.
 
 
 3
 Between 1982 and 1994, the plaintiffs performed clerical work at the Center. Plaintiffs were trained by and worked with PG & E employees. The plaintiffs used PG & E's computer system, telephones and e-mail. PG & E sent the Center employees, including plaintiffs, to classes and seminars regarding debt collection, customer service, and general office skills. They were required to attend PG & E's programs regarding sexual harassment and emergency response training. PG & E gave the plaintiffs PG & E business cards and letterhead and on occasion use of PG & E company cars. The plaintiffs' work-related expenses, including travel expenses, were reimbursed directly by PG & E. Both PG & E and Stafco provided supervisors to oversee the day-to-day operations of the Center. Throughout their time at the Center, the plaintiffs' wages were paid by Volt, PCC or Stafco, not PG & E.
 
 
 4
 On January 1, 1994, PG & E and Stafco entered into a new and substantially different contract for the operation of the Center. Under the new contract, PG & E transferred the primary authority for the daily control over the Center to Stafco. At the same time, PG & E stopped: (1) allowing the Center employees to use PG & E business cards and letterhead; (2) providing training classes for the Center employees; (3) reimbursing work-related expenses; and (4) providing company cars to the Center employees. The Stafco project manager, who received greater authority to supervise the Center, stated that Stafco intended to become more independent of PG & E and to function as a separate business entity.
 
 
 5
 All but one of the plaintiffs were employed at the Center at the time the new contract took effect on January 1, 1994. Subsequently, one plaintiff resigned, two were laid off in 1994, four were laid off in 1995, and one was laid off in 1997. Four plaintiffs continue to work at the Center.
 
 
 6
 PG & E provided several employee benefit plans to its employees, including a retirement plan, a savings plan, a health plan, and a severance plan. The retirement and savings plans are, by their terms, available to "employees" but not to "leased employees, as defined by Section 414(n) of the Internal Revenue Code." PG & E's health and severance plans did not expressly exclude leased employees from coverage. Under the health plan, an employee was automatically enrolled on the first day of work in a medical plan without dependent coverage. Under the severance plan, a terminated employee would be entitled to severance benefits upon satisfying certain requirements, such as the completion of severance pay forms.
 
 
 7
 On March 7, 1995, plaintiffs' counsel informed PG & E that they considered themselves PG & E employees and accordingly intended to claim the right to benefits under PG & E's employee benefit plans. The counsel also requested copies of the PG & E plan documents. In response, PG & E denied that the plaintiffs were its employees and refused to provide the requested copies. On December 26, 1995, plaintiffs filed this action seeking benefits under the plans (ERISA § 502(a)(1)(B)), injunctive and declaratory relief (ERISA § 502(a)(3)), penalties for failing to provide requested plan information (ERISA § 502(c)(1)(B)), and damages based on the wrongful termination they claim was affected by the January 1, 1994 agreement (ERISA § 510).
 
 
 8
 PG & E and the plaintiffs filed cross motions for summary judgment. The district court granted summary judgment in favor of PG & E, finding that: (1) the plaintiffs were leased employees, properly excluded from the pension and retirement plans, and therefore lacked standing under ERISA to sue for benefits under PG & E's pension and retirement plans; (2) the plaintiffs lacked standing to sue for benefits under PG & E's health and severance plans because their right to such benefits had not vested; (3) the plaintiffs' ERISA § 510 claim was time-barred by the one-year statute of limitations; and (4) PG & E did not violate ERISA § 502 by refusing to provide copies of its plans to the plaintiffs because the latter were not participants in the plans. The plaintiffs appeal.
 
 DISCUSSION
 A. Standing Under ERISA
 1. Standard of Review
 
 9
 We review a denial of ERISA benefits de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." See Estate of Shockley v. Alyeska Pipeline Service Co., 130 F.3d 403, 405 (9th Cir.1997), (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989)). If the plan gives the administrator or fiduciary discretionary authority, we review the denial of benefits for abuse of discretion. Estate of Shockley, 130 F.3d at 405; Parker v. BankAmerica Corp., 50 F.3d 757, 763 (9th Cir.1995).
 
 
 10
 The PG & E pension and retirement plans in effect in 1989, 1993, and 1994 grant the plan administrator the authority to "make such computations, interpretations, and decisions as may be necessary or desirable for the proper administration of the PLAN." CR-38, Ex. N, p. 82; CR-55; Ex. D., p. 19; CR-55, Ex. E. p. 12. This grant of discretionary authority would, under ordinary circumstances, require an abuse of discretion review. However, in this case, the retirement plan incorporated by reference the determination of benefits based upon an interpretation of I.R.C. § 414(n), defining "leased employees." The interpretation of § 414(n) is a question of law which we review de novo. See Jeldness v. Pearce, 30 F.3d 1220, 1222 (9th Cir.1994) ("Statutory interpretation is a question of law reviewed de novo."); Spink v. Lockheed Corp., 125 F.3d 1257, 1260 (9th Cir.1997) (interpretation of ERISA, a federal statute, is reviewed de novo).
 
 
 11
 In addition, the district court found that plaintiffs lacked standing to challenge the denial of benefits under both the health and severance plans. Thus, the latter ruling presents solely a question of law.
 
 2. Standing Generally
 
 12
 In order to have standing to bring a civil action under ERISA, the plaintiff must be a participant in or beneficiary of an ERISA plan. See 29 U.S.C. § 1132(a)(1)(B) (1996); Freeman v. Jacques Orthopaedic and Joint Implant Surgery Medical Group, Inc., 721 F.2d 654, 655 (9th Cir.1983). The applicable statute, 29 U.S.C. § 1002(7), defines participant as "any employee or former employee ... who is or may become eligible to receive a benefit of any type from an employee benefit plan...." A former employee may qualify as a participant under ERISA if he has "a reasonable expectation of returning to covered employment or ... a colorable claim to vested benefits." Firestone, 489 U.S. at 117, 109 S.Ct. 948 (internal quotations omitted);[2] see Curtis v. Nevada Bonding Corp., 53 F.3d 1023, 1027 (9th Cir.1995).
 
 
 13
 As the district court noted, none of the plaintiffs was an employee of PG & E at the time they filed their suit.[3] It is also clear that the plaintiffs do not have any reasonable expectation at this point of returning to employment with PG & E. Therefore, the plaintiffs must establish that they have a colorable claim to vested benefits under the various PG & E plans in order to have standing.
 
 
 14
 3. Standing Under PG & E's Pension and Retirement Plans
 
 
 15
 The district court concluded the plaintiffs have no colorable claim to vested benefits, and thus lacked standing to sue under the pension and retirement plans because the plaintiffs were expressly excluded from the plans' coverage. In reaching that conclusion, the district court found the plaintiffs satisfied the definition of "leased employees" set forth in I.R.C. § 414(n), 26 U.S.C. § 414(n) (1996).
 
 
 16
 The PG & E pension and retirement plans offer benefits to PG & E employees, but provides that "a 'leased employee,' as defined in Section 414(n)(2) of the Internal Revenue Code, shall not be considered an EMPLOYEE eligible to become a PARTICIPANT in the PLAN." During the time in question, § 414(n) provided:
 
 
 17
 [T]he term "leased employee" means any person who is not an employee of the recipient and who provides services to the recipient if--
 
 
 18
 (A) such services are provided pursuant to an agreement between the recipient and any other person (in this subsection referred to as the "leasing organization"),
 
 
 19
 (B) such person has performed such services for the recipient ... on a substantially full-time basis for a period of at least 1 year, and
 
 
 20
 (C) such services are of a type historically performed, in the business field of the recipient, by employees.
 
 
 21
 26 U.S.C. § 414(n) (1994) (emphasis added).
 
 
 22
 In 1996, Congress amended § 414(n) by replacing the "historically performed" language of subsection (C) with "such services are performed under primary direction or control by the recipient." 26 U.S.C. § 414(n) (1996). Neither version of § 414(n) nor the Internal Revenue Code defines "employee," and accordingly the common-law definition of "employee" should be used in its place. See Rev.Rul. 87-41, 1987-1 C.B. 298 ("An individual is an employee ... if the individual has the status of an employee under the usual common law rules applicable in determining the employer-employee relationship."); Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992) ("[W]e adopt a common-law test for determining who qualifies as an 'employee' under ERISA...."). Therefore, under the plain meaning of § 414(n), a leased employee is any person who: (1) is not a common-law employee of the recipient, and (2) satisfies the three enumerated requirements. In other words, a common-law employee of the recipient cannot qualify as a leased employee under § 414(n).
 
 
 23
 The plain meaning of § 414(n) is supported by the legislative history of the 1996 amendment:
 
 
 24
 As under present law, the determination of whether someone is a leased employee is made after determining whether the individual is a common-law employee of the recipient. Thus, an individual who is not a common-law employee of the service recipient could nevertheless be a leased employee of the service recipient. Similarly, the fact that a person is or is not found to perform services under primary direction or control of the recipient for purposes of the employee leasing rules is not determinative of whether the person is or is not a common-law employee of the recipient.[4]
 
 
 25
 S.Rep. No. 104-281, at 93, reprinted in 1996 U.S.C.C.A.N. 1567 (emphasis added).
 
 
 26
 The district court erroneously concluded that the plaintiffs were leased employees under § 414(n) even assuming they qualified as common-law employees. In so doing, the district court did not believe the term "employee" in § 414(n) was intended to include common-law employees. We think the plain wording of the statute contradicts this finding. Furthermore, the legislative history for the 1996 amendment to § 414(n) belies this conclusion. Congress expressly stated that the determination of whether an individual employee is a common-law employee must be made before the determination of whether the individual is a leased employee. Id. Additionally, the Supreme Court has held that to determine who is an "employee" under ERISA, courts should use the common-law test as set forth in Community for Creative Non-Violence v. Reid, 490 U.S. 730, 751-52, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). See Darden, 503 U.S. at 323-24, 112 S.Ct. 1344.[5]
 
 
 27
 The district court also concluded that to read "employee" to include "common-law employee" would create a resulting anomaly that Congress could not have intended. The district court stated: "[I]f the plaintiffs' interpretation of § 414(n)(2) is to be accepted, the leased employee category is reduced to the virtual null set of those employees who work under the supervision and direction of an employer and yet are not common law employees of the employer." Burrey v. Pacific Gas & Electric Co., No. C-95-4638, slip op. at 11 (N.D.Cal. May 2, 1997). This, the district court found, could not have been Congress' intended result.
 
 
 28
 We believe the district court's reasoning is flawed in two ways. First, the "primary direction or control" requirement under § 414(n) was added in 1996; the plaintiffs' claims are for benefits allegedly owed to them between 1988 and 1994. Therefore, the wording of the prior § 414(n) is controlling in this analysis. Second, the district court mistakenly equates the common-law test of employee status with the "primary direction and control" element added by the 1996 amendment.[6] Whether an employer has primary direction and control over the individual is only one of the twenty factors used to determine common-law employment status. See Reid, 490 U.S. at 751, 109 S.Ct. 2166. Additionally, the district court's interpretation effectively renders superfluous the phrase "who is not an employee" in § 414(n). In interpreting a statutory provision, we must avoid any construction that renders some of its language superfluous. See Hearn v. Western Conference of Teamsters Pension Trust Fund, 68 F.3d 301, 304 (9th Cir.1995); see also Security Pacific Nat. Bank v. Resolution Trust Corp., 63 F.3d 900, 905 (9th Cir.1995).
 
 
 29
 We also reject the district court's interpretation of and reliance upon Abraham v. Exxon Corp., 85 F.3d 1126 (5th Cir.1996) to support its holding. The district court read Abraham to implicitly hold that common-law employees can be properly excluded from a benefit plan as leased employees. At issue in Abraham was whether employers are forbidden from discriminating against leased employees when designing an ERISA plan. The Fifth Circuit merely assumed that the individuals were leased employees, and concluded that an employer may bar leased employees from participating in its ERISA plan. Id. at 1130. In this case, the question is not whether PG & E can bar a leased employee from participating in its ERISA plans. Rather, the question is whether the plaintiffs qualify as common-law employees under § 414(n).[7]
 
 
 30
 We hold that "employee" as used in § 414(n) means "common-law employee" and an individual's employment status under § 414(n) should be determined using the twenty-factor test adopted in Darden. We do not address here whether the plaintiffs could qualify as common-law employees. Instead, we merely conclude that the district court erred by not considering whether the plaintiffs qualified as common-law employees as a threshold determination of whether the plaintiffs were leased employees under § 414(n). We therefore reverse the district court's order and remand this issue in order that the district court may make a determination of the plaintiffs' employment status under § 414(n).
 
 4. Standing Under PG & E Health Plan
 
 31
 In order to have standing to sue under PG & E's health plan, the plaintiffs must establish that they have a colorable claim of right to vested benefits under that plan. See Firestone, 489 U.S. at 117, 109 S.Ct. 948. The district court found that the plaintiffs lacked standing because (1) health benefits are not vested benefits under ERISA, and (2) the plaintiffs had not participated in the health plan.
 
 
 32
 Health care benefits are included within the term "welfare benefits," which are not subject to the same minimum vesting requirements under ERISA as pension benefits. See West v. Greyhound Corp., 813 F.2d 951, 954 (9th Cir.1987). However, this does not mean that the plaintiffs cannot have a colorable claim to accrued or vested benefits under the plan. The plaintiffs are not asserting that they are entitled to health plan benefits for medical expenses incurred after their period of employment. Instead, the plaintiffs contend that as common-law employees of PG & E, they had been automatically enrolled in the medical plan and therefore entitled to reimbursement for medical expenses the plaintiffs incurred during their employment at the Center, the same as the regular PG & E employees received. In a more general sense, then, the plaintiffs are claiming a right to a benefit, i.e. reimbursement for medical expenses incurred as employees enrolled under the plan, to which any PG & E employee enrolled in the plan would be entitled.
 
 
 33
 Under the terms of the Basic Health Plan, if the plaintiffs qualify as common-law employees, then they were automatically enrolled in the plan upon commencement of their employment, and thus participants in the health plan.[8] The PG & E Basic Health Plan provides:
 
 3. PARTICIPATION
 
 34
 a. Except as specified in Section 3.b below, to become a PARTICIPANT, an EMPLOYEE must submit a completed ENROLLMENT FORM to the COMPANY within 31 days of becoming an EMPLOYEE....
 
 
 35
 b. An EMPLOYEE shall automatically be enrolled in the PLAN without DEPENDENT coverage on the first day of employment with the COMPANY or an EMPLOYER. EMPLOYEE coverage shall continue until the date coverage commences under another COMPANY-offered medical plan following the EMPLOYEE'S election.
 
 
 36
 c. An EMPLOYEE who does not enroll in the PLAN when initially eligible, or who fails to submit a completed ENROLLMENT FORM during an open enrollment period designated by the COMPANY once each year, shall automatically be enrolled in the PLAN without DEPENDENT coverage. EMPLOYEE must wait until the next open enrollment period, as designated by the COMPANY once each year, before he may change plans and/or enroll his eligible DEPENDENTS. Such benefits shall become effective the following January 1.
 
 
 37
 The plan requires that in order to become eligible for more extensive health coverage, including dependent coverage, a PG & E employee must complete and return to the company an enrollment form. However, even in the absence of the enrollment form, each PG & E employee is automatically enrolled in a more basic health coverage plan that does not include dependent coverage. Therefore, if the district court determines that the plaintiffs qualify as common-law employees of PG & E under the Darden test, then the plaintiffs have a colorable claim to benefits, and thus have standing to sue for benefits under the health plan.
 
 5. Standing Under PG & E's Severance Plan
 
 38
 Unlike the health plan, PG & E's employees were not automatically enrolled in the severance plan. PG & E's 1993 and 1994 severance plans provide:
 
 INVOLUNTARY SEVERANCE PROGRAM
 
 39
 This option will be made available to all management and non-bargaining unit employees who are not offered a regular position by the end of the second 45-day redeployment period. Payment is dependent on the signing of the Severance Agreement and Release prior to the end of the second 45-day period, and the expiration of the seven-day revocation period.
 
 
 40
 CR-55, Ex. A, p. 14; Ex. B, p. 12.
 
 
 41
 These severance plans conditioned entitlement to severance benefits upon the timely completion of the Severance and Agreement Release. In other words, a PG & E employee could not participate in the severance plan without first completing and returning this agreement. The plaintiffs do not contend they satisfied this requirement of the severance plans. In the absence of such participation, the plaintiffs, even if PG & E common-law employees, are not entitled to benefits under the severance plan, and thus do not have a colorable claim to benefits under the plan. Therefore, we agree with the district court that plaintiffs lack standing to sue for benefits under the severance plan.
 
 B. Section 510 Claim
 
 42
 The plaintiffs claim that the January 1, 1994 agreement between PG & E and Stafco resulted in the wrongful termination of their employment with PG & E, in violation of ERISA Section 510.[9] The district court found that the plaintiffs' Section 510 claim was time-barred by a one-year statute of limitations. On appeal, the plaintiffs assert that the appropriate statute of limitations is two-years, not one, and the claim is therefore not time-barred. We review the district court's determination of the appropriate statute of limitations de novo. See Hilao v. Estate of Marcos, 103 F.3d 767, 773 (9th Cir.1996). For the following reasons, we affirm the dismissal by the district court.
 
 
 43
 Section 510 of ERISA does not contain a statute of limitations. We therefore must apply the most analogous state law limitations period. Felton v. Unisource Corp., 940 F.2d 503, 510 (9th Cir.1991). In Felton, we recognized that "a claim brought under § 510 is essentially an assertion that the employee was discriminated against based on either his application for insurance benefits or his pension eligibility." Id. at 512. We then held that "the most analogous state law claim would be wrongful termination against public policy or retaliatory discharge." Id.
 
 
 44
 As the California Court of Appeals recently recognized, there is some uncertainty regarding which California statute of limitations governs a wrongful termination action. See Barton v. New United Motor Mfg., Inc., 43 Cal.App.4th 1200, 1205, 51 Cal.Rptr.2d 328 (Cal.Ct.App.1996). This Court has found on several occasions that the statute of limitations for a tort action for wrongful termination in violation of public policy is the one-year period set forth in the California Code of Civil Procedure section 340, subdivision (3). See Funk v. Sperry Corp., 842 F.2d 1129, 1133 (9th Cir.1988); Hinton v. Pacific Enters., 5 F.3d 391, 394 (9th Cir.1993) (dicta). We have also applied the two-year statute of limitations set forth in the California Code of Civil Procedure section 339(1) in an action for wrongful termination. See Daniels v. Fesco Div. of Cities Serv. Co. ., 733 F.2d 622, 623 (9th Cir.1984); Eisenberg v. Insurance Co. of N. America, 815 F.2d 1285, 1292 (9th Cir.1987) (breach of covenant of good faith and fair dealing claim).
 
 
 45
 The California Court of Appeals addressed this apparent inconsistency in Barton, and concluded that where "the primary nature of the right sued upon in a ... wrongful termination action is personal," the one-year statute of limitations period applies. Barton, 43 Cal.App.4th at 1209, 51 Cal.Rptr.2d 328. In so finding, the court stated:
 
 
 46
 The statute of limitations to be applied in a particular case is determined by the nature of the right sued upon or the principal purpose of the action, not by the form of the action or the relief requested. What is significant for statute of limitations purposes is the primary interest invaded by defendant's wrongful conduct.
 
 
 47
 * * *An action for wrongful discharge in violation of public policy must be predicated on a policy that concerns society at large rather than the individual interests of the employer or employee. At the same time, the essential nature of the action is the protection of certain personal rights deemed to be of fundamental public importance, not the protection of property rights.... [T]he gravamen of the wrongful termination action is the violation of some personal right considered to be of fundamental public importance, protected or guaranteed either by statute or the Constitution, not the financial or economic loss from the termination of employment.
 
 
 48
 Id. at 1207-09, 51 Cal.Rptr.2d 328 (citations omitted).
 
 
 49
 In light of Barton, we conclude the one-year statute of limitations set forth in the Code of Civil Procedure section 340(3) applies to the plaintiffs' ERISA Section 510 claim. The plaintiffs allege that their employment was effectively terminated by the January 1, 1994 agreement between PG & E and Stafco. The plaintiffs did not file their Section 510 claim until December 26, 1995, more than one year after the alleged termination. Therefore, under Barton, the plaintiffs' Section 510 claim is time-barred.
 
 C. Refusal to Supply PG & E Plan Documents
 
 50
 In the plaintiffs' final claim, they assert PG & E should be found liable under ERISA § 502(c)(1)(B) for its failure to provide the plaintiffs with copies of its benefits plan documents. The plaintiffs requested copies of plan documents on March 7, 1995, PG & E refused to comply with the request stating that it did not consider the plaintiffs to be entitled to receive the documents. The district court concluded that because the plaintiffs were not participants under PG & E's plans, they were not entitled to receive copies of the plan documents.
 
 
 51
 An administrator of an employee pension benefit plan is required to provide copies of plan documents to "any plan participant or beneficiary" requesting such documents. 29 U.S.C. § 1024(b)(4) (1996). As the district court noted, a "participant" is "any employee or former employee ... who is or may become eligible to receive a benefit of any type from an employee benefit plan." Weiss v. Sheet Metal Workers Local No. 544 Pension Trust, 719 F.2d 302, 303 (9th Cir.1983). As discussed in the preceding sections herein, the plaintiffs may qualify as participants under the pension and retirement benefit plans and the health benefit plan if they satisfy the common-law employee test set forth in Darden. Therefore, with respect to the pension, retirement and health benefit plan documents the plaintiffs requested, we vacate the district court's finding and remand for reconsideration after the district court determines the plaintiffs' employment status. However, the plaintiffs have no colorable claim to benefits under the severance plan, and therefore cannot maintain an action under Section 501(c)(1)(B) against PG & E with respect to severance plan documents.
 
 
 52
 Affirmed in part and reversed in part.
 
 
 
 *
 Honorable Donald P. Lay, Senior Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 Defendants did not dispute this statement of facts prepared by the plaintiffs, although they reserved the right to do so at trial
 
 
 [2]
 The Court went on to state that "A former employee who has neither a reasonable expectation of returning to covered employment nor a colorable claim to vested benefits, however, simply does not fit within the [phrase] 'may become eligible.' " Firestone, 489 U.S. at 118, 109 S.Ct. 948 (quoting Saladino v. I.L.G.W.U. National Retirement Fund, 754 F.2d 473, 476 (2d Cir.1985))
 
 
 [3]
 The plaintiffs contend that the January 1, 1994 employment agreement between Stafco and PG & E so significantly altered the terms of their employment that their employment was in effect terminated
 
 
 [4]
 This legislative history indicates that the initial determination of common-law employee status had to be made under both the 1994 version and amended 1996 version of § 414(n)
 
 
 [5]
 The Supreme Court enunciated the following factors to be used to determine employment status in Reid:
 In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party. 490 U.S. at 751-52, 109 S.Ct. 2166.
 
 
 [6]
 The district court relies, in part, on the following phrase from the 1996 legislative history: "[P]ersonnel who are subject to the day-to-day control of the employer in essentially the same manner as a common law employee are treated as leased employees if the period of service threshold is reached." S.Rep. No. 104-281, at 94, reprinted in 1996 U.S.C.C.A.N. 1568. The district court suggests this statement shows that Congress did not intend to exclude common-law employees from attaining leased employee status. To the contrary, this statement recognizes that persons under day-to-day control of an employer may resemble a common-law employee in this one aspect
 
 
 [7]
 In further support of its holding, the district court found that, to interpret "employee" to include "common-law employee" would create "an administrative burden on the administrator" and "pose a threat to the solvency of the plan." While these are valid concerns, they are not sufficient to override the plain meaning of § 414(n) and its legislative history
 
 
 [8]
 In holding that plaintiffs were not "participants" and therefore lacked standing, the district court relied upon Kuntz and Freeman. The district court believed that the plaintiffs were asking it "to do precisely what the Kuntz and Freeman courts explicitly stated that they could not do, namely make plaintiffs participants in an ERISA plan in which they never in fact participated." Burrey v. Pacific Gas & Electric Co., No. C-95-4638, slip op. at 9. However, the plaintiffs do not contend they were wrongly denied participation in the plan, as was the case in Kuntz and Freeman, but rather that they were participants in the heath plan by virtue of the automatic enrollment provision
 
 
 [9]
 Section 510 provides in part:
 It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan.... 29 U.S.C. § 1140 (1996).